# Richmond.

GORDON'S EX'ORS AND ALS v. R., F. & P. R. R. CO. AND ALS.

April 10th, 1884.

1. RAILWAY COMPANIES—*Guaranteed stock—Dividends.*—On 27th May, 1857, R, F & P R R Co., under act of 13th February, 1856, (see Acts 1855–56, p. 108), issued certificates of seven per cent. guaranteed stock, endorsed that the president and directors should pay thereon semi-annual dividends on the 1st of May and November of each year of not less than three and a half per cent., and that any holder was entitled to receive any excess of semi-annual dividend beyond three and a half per cent. which might at any time be paid on the common stock. And on 21st November, 1866, said company, under act of 13th December, 1865, issued certificates of six per cent. guaranteed stock, similarly endorsed. On 16th December, 1881, said company issued to the holder of each share of common stock a dividend obligation of $100, bearing in lieu of interest the dividend payable on each share of common stock at the several dates when such dividends should be payable, and entitled in any dividend of the assets of the company to share ratably in same, and declared a dividend of two dollars on each share of common stock and on each dividend obligation of $100, payable on 2d January, 1882, and semi-annually thereafter, but made no similar provision for the holders of the guaranteed stock.

HELD:

 1. Those acts empowered the company to issue guaranteed stock of the kind indicated.

 2. The holders of such stock are entitled to participate equally with the holders of common stock in any larger dividends declared in in favor of the latter, without impairing the claims of the former always to receive at least seven per cent. per annum on each share of $100.

 3. The holders of the guaranteed stock are entitled not only to participate in due proportion in the cash dividends declared in favor of the holders of the common stock, but also in the issuance of dividend obligations.

4. The stock issued under these acts is guaranteed capital in the strictest sense. Its dividends (seven or six per cent., as may be) are payable out of the gross receipts of the company, and in a division of the assets, must be paid, if need be, to the exclusion of the common stock. But as to any excess of semi-annual dividends, to which the said guaranteed stock may be entitled beyond the three and a half or three per cent. guaranteed it, it must stand upon the same footing as the common stock.

2. CORPORATIONS—*Earnings—Dividends.*—The earnings belong primarily to the corporation. There can be no such thing as a dividend until it is declared. Where the directors fail to declare dividends at the stated times, as directed by the charter, it is not in their power to declare a dividend to extend back over the periods during which they had failed to declare dividends.

Appeal from decree of circuit court of city of Richmond, rendered 7th July, 1883, in two causes in chancery, consolidated and heard together. The complainants in the one were Douglas H. Gordon's executors and others, suing for themselves and other holders of the guaranteed stock of the Richmond, Fredericksburg and Potomac Railroad Company, and in the other were the City Fire Insurance Company of Richmond and others suing similarly. And the defendants in both were the Richmond, Fredericksburg and Potomac Railroad Company, and the Board of Public Works of Virginia, Ann W. Anderson, A. Sidney Biddle and others, the holders of the common stock of the said company. The object of these suits was to enforce the contracts between the holders of the said guaranteed stock and the said company, as expressed on the face of the said stock, and to have the rights of said holders passed on and enforced in respect to a participation in the dividends of said company, and especially under the resolution of its stockholders in general meeting in December, 1881, and the consequent action of its board of directors in issuing certificates known as "dividend obligations" to the holders of the common stock. Demurrers and answers were filed, and by its said decree the said cir-

cuit court dismissed the bills of the complainants with costs to the defendants; and the complainants obtained from one of the judges of this court an appeal and *supersedeas*.

The opinion states the facts.

*James Pleasants* and *Carrington & Fitzhugh,* for appellants, Gordon's ex'ors and als.

*John A. Coke,* for appellants, City Fire Insurance Company and als.

*James N. Dunlop,* for appellants, Harrison and als.

*Wm. W. Henry,* for appellees, R., F. & P. R. R. Co. and als.

*F. S. Blair, Attorney-General,* for appellee, the Board of Public Works of Virginia.

HINTON, J., delivered the opinion of the court.

By an act of the general assembly of Virginia, passed on the 13th day of February, 1856, the Richmond, Fredericksburg and Potomac Railroad Company was authorized " to extend their railroad so as to form a junction with the Orange and Alexandria railroad, at its point of intersection with the Manassas Gap railroad." And "for the purpose of carrying out the objects of this act and any other acts in relation to said company," they were authorized by the second section of the act " to increase their capital stock in such manner as they may deem advisable, to the extent of one million of dollars, in addition to the amount hitherto authorized"; or they might, to such extent as might be deemed advisable to do so, borrow money at a rate of in-

terest not exceeding seven per centum, and issue proper certificates or evidences of debt therefor, and make the same convertible into stock at the pleasure of the holder, and secure the punctual payment of the principal and interest of such loans by a deed of trust on all the property of the company and its franchises: provided the aggregate amount of stock and convertible loan issued under the authority of this section shall not exceed the sum of one million of dollars.  Acts 1855–56, p. 108, ch. 130.

Under the authority of this act the stockholders met on the 27th of May, 1857, in regular meeting, and by resolutions adopted on that day increased the capital stock of the company by issuing two thousand shares of what was then and has been since, until this controversy arose, regarded and treated as guaranteed seven per cent. stock, entitled to receive a minimum of three and a half per cent. semi-annually, and "privileged to received any excess of semi-annual dividend beyond three and a half per cent., which may be at any time paid on the common stock of the company without impairing the guaranty of seven per cent. per annum given by this resolution."  These certificates had printed on their face the resolutions under which they were issued, which are as follows:

"1st. Resolved, That the capital stock of the company be and the same are hereby increased the amount of two thousand shares.

"2d. Resolved, That the said two thousand shares be and the same are hereby constituted a guaranteed stock, entitled, under any circumstances, to receive seven per cent. per annum, and that the president and directors be, and they are hereby, instructed to pay semi-annual dividends on the said shares, on the first day of May and November of each year, of not less than three and a half per cent., any holder of the said guaranteed shares being privileged to receive any excess of semi-annual dividend beyond three

and a half per cent. which may be at any time paid on the common stock of the company without impairing the guaranty of seven per cent. given by this resolution.

"3d. Resolved, That for the purpose of securing, beyond any contingency, the payment of seven per cent. per annum on the guaranteed shares created by the above resolutions, the president and directors be, and they are hereby, irrevocably instructed, in the event of its being at any time hereafter deemed requisite or advisable for this company to give a deed of trust or mortgage on any of its property or privileges, to embrace the shares of stock hereby created, in the first deed of trust or mortgage which may be given by the company, and to protect the guaranty given in the preceding resolution, by making the principal of the whole guaranteed stock created by the above resolutions, and seven per cent. dividend on the same, part of a first lien on all the property, rights, privileges and franchises of the company, and a debt of the company immediately payable, in the event of any default in the punctual payment of the dividends hereby guaranteed."

The company deemed it advisable to execute such a deed of trust, and accordingly it was done on the 27th of May, 1881. This deed embraced "all of the works and property of the said company," and secured, besides the said guaranteed stock, certain other obligations of the company. Of the stock thus issued and secured, the estate of Douglas H. Gordon, dec'd, holds   -   235 shares.

Ann C. Thomas holds   -   -   -   -   20 shares.

Robert L. Harrison holds   -   -   -   10 shares.

On the 13th of December, 1865, another act was passed by the general assembly authorizing an increase of the company's stock to such an extent as might be requisite to enable them to liquidate all arrears of debts, interest and dividends of the company, and to make such portion of the said increased capital stock as they might deem advisable,

a "guaranteed stock" on which dividends of not exceeding 7 per cent. per annum might be guaranteed to be paid semi-annually: provided, such increase of the capital stock should not exceed in the aggregate the sum of one million of dollars. Acts 1865-6, p. 332, ch. 210.

Under the authority of this act the stockholders met, on the 21st of November, 1866, and authorized the issue of "certificates of guaranteed 6 per cent. stock, in shares of $100 each, expressing on their face that the holder should be entitled to receive, on May 1st and November 1st, of each year, not less than $3 per share, and that for the punctual payment of the same the company pledge its whole property, profits and franchises, to such holders of the 6 per cent. bonds or interest coupons of the company, as should, before March 1st, 1867, consent to receive the same at par in liquidation of an equal amount of interest upon the 6 per cent. bonds or interest coupons of the company then due and unpaid, which should be held by them respectively, including all interest then accrued upon such instalments of interest or interest coupons, from the dates which such instalments or coupons were severally due, to January, 1867." And it was further provided by the resolutions passed on that day, and which are printed upon the face of these certificates, "that any rate of dividends which should, at any time, be declared or made on the common stock of the company greater than was required to be paid on the 6 per cent. guaranteed stock thereby authorized, should at all times be equally paid on all such guaranteed stock."

And the board of directors were authorized thereby to pay to the holders of such guaranteed stock, into which the arrears of interest and guaranteed dividends should be funded in accordance therewith, the guaranteed dividends which should accrue on such guaranteed stock, without any deductions from their amounts for any public taxation.

Of this issue of guaranteed stock, amounting to 193 shares—

| | |
|---|---:|
| Ann C. Thomas holds - - - - | 3 shares. |
| City Fire Ins. Co. holds - - . - - | 58 shares. |

On the same day, Nov. 21, 1866, the stockholders, under authority of the before-mentioned act of December 13, 1865, authorized an issue of guaranteed 7 per cent. stock, amounting to 1,271 shares, and caused the resolutions directing the issue to be printed on the face of the certificates.

Of this issue the estate of

| | |
|---|---:|
| Douglas H. Gordon, deceased, holds - | 89 shares. |
| Ann C. Thomas holds - - - | 6 shares. |
| Eliza L. C. Harrison holds - - - | — shares. |

On November 18, 1868, the stockholders, by resolution passed that day, under the said act of February 13, 1856, authorized the board of directors to issue to such holders of the 6 per cent. certificates of debt of the company, due July 1, 1869, as might elect to convert such certificates into guaranteed stock, one share of the capital stock of the company, guaranteed to yield not less than 7 per cent. per annum, free from all public taxation, payable semi-annually, and to participate in any larger dividend that might be declared on the company's stock for every $100 of such certificates. Under this resolution certificates issued to the amount of 1,312 shares, the resolution being printed on the face thereof.

Of this last named issue the estate of Douglas H.

| | |
|---|---:|
| Gordon, deceased, holds - - · | 3 shares. |
| Ann C. Thomas holds - - - | 5 shares. |
| Marcellus Smith holds - - - | 10 shares. |
| William R. Massie holds - - - | 6 shares. |

On the 8th of May, 1871, another issue of 228 shares of guaranteed 7 per cent. stock, under similar resolutions, was made, under the act of February 13th, 1856, but as none of this issue is held by any of the appellants it need not be further noticed.

At a meeting of the stockholders, held November 16th, 1881, the president made a report, reciting the fact that no dividends had been paid on the common stock for many years, although the net profits of the company each year had been considerable, and that these net profits, having been used in the purchase of the real estate used in making other permanent additions to the company's property, had been placed to the credit of profit and loss, and then amounted to $755,039.10, which might have been in dividends to the common stockholders if the board had thought it wise to increase the company's fixed charges by borrowing money for the purpose of making these additions to its property. He further stated in said report that the board believed, in view of the improved condition of the road and of the country supporting it, it would in the future be able to pay a fair dividend, say two per cent. semi-annually, upon its common stock and *upon the amount theretofore retained from the stockholders and passed to the credit of profit and loss.* For these reasons, and to enable the stockholders to receive the equivalent of interest for the use of the money so withheld without adding to the fixed charges of the company, he stated that the board recommended that the stockholders should pass the resolution following :

" Resolved, That for the purpose of dividing among the common stockholders of the company the amount standing upon its books to the credit of profit and loss, which amount has heretofore been earned by the company and expended in permanent additions to and improvements of the company's property, instead of being used in the payment of dividends, the board of directors be, and they are hereby authorized, in their discretion, to issue dividend obligations or certificates in amounts of $100, or multiples of that amount, bearing in lieu of interest on each $100 of the certificates, the dividend payable on each share

of the common stock of the company at the several dates when such dividends shall be payable, and entitled in any dividend of the assets of the company to share in a corresponding proportion of the same. For the fractional part of $100 to which any stockholder may be entitled, there shall be issued to him a certificate of dividend scrip, which certificate may be converted at the option of the holder into dividend obligations when presented in sums of $100, but which shall not be entitled to interest or a share of the dividends until so converted."

The foregoing resolution having been adopted, the board of directors at their next meeting, held on the 8th of December, 1881, passed a resolution declaring a dividend of two dollars per share on the common stock, payable January 2, 1882, and providing that the same amount be paid at the same time on each dividend obligation of one hundred dollars. Dividend obligations framed in accordance with the terms of the resolution of November 16, 1881, were issued to the common stockholders, and a dividend of two dollars per share was paid to them on the 1st January, 1882, and has been subsequently paid every six months. The guaranteed stockholders, however, were wholly excluded from a participation in the dividend obligations, and this is their ground of complaint in the two above-named suits.

The company, on the other hand, to justify this exclusion of the guaranteed stockholders from a participation in this scrip dividend, assigns various reasons. Amongst these, however, the only one which, in the view we take of this case, could by any possibility avail as a defence, is the suggestion that the acts under which the appellants claim that the guaranteed scrip held by them was issued, do not authorize an issue of any such stock as that held by the appellants.

With a view, therefore, to ascertain the soundness of this

defence, we proceed to an examination of the act which has been most vigorously assailed—namely, the act of February 13, 1857—observing, however, in passing, that if the object and intent of the legislature be kept steadily in view, it will materially assist us in arriving at a correct interpretation of the act; and further, that the object of the enactment being, as we shall see, plain and unequivocal, that construction must be adopted which will best effectuate the intentions of the legislature. Potter's Dwarris on Statutes and Constitutions, 201–202. And the resolutions, annual reports and other proceedings are competent evidence for the purpose of showing the real character of the transaction. *Boardman* v. *Lake Shore and Michigan Company*, 84 N. Y. 172.

Now, as the act on its face shows, this company had been authorized to extend its road so as to form a junction with the Orange and Alexandria railroad, and it was for the purpose of carrying out this and other acts in relation to this defendant company that they were authorized to increase the capital stock of the company *" in such manner as they may deem most advisable,* to the extent of one million dollars, in addition to the amount before authorized; or they might, *to such extent* as might be deemed advisable, *borrow money* at a rate of interest not exceeding seven per cent., convertible into stock at the pleasure of the holder; the aggregate amount of such stock and convertible loan being, however, limited to an amount which should not exceed the sum of one million dollars."

To accomplish these objects it was necessary that money should be raised. And this the legislature empowered the company to do, in one, or both, of two entirely dissimilar ways. It might do it by an issue and sale of stock; or it might borrow it; or it might do both. It is clear, however, that it was not contemplated by the legislature that the stock thus authorized to be issued would be common

stock. The members of that body, we must presume, were men of fair ability, and must have known that loan certificates bearing a good rate of interest, with both principal and interest well secured, would command a much better price than the common and unsecured stock of the company. They were in the act of providing for an issue of just such certificates to bear, perhaps, as high a rate of interest as seven per centum, and were making these certificates convertible, at the option of the holder, into this stock. Now, what sort of stock must they have intended this stock to be? Why, manifestly, not common stock, but such a sort or character of stock as would be certainly equivalent in value to, perhaps, more valuable than the loan certificates. The purpose of the legislature was, we repeat, to authorize the creation of a stock from the ready sale of which a large amount of money could be raised. The legislature knew that the company already had the right to increase its common stock, but they knew more; they, doubtless, knew that the common stock was salable only at a large discount, and that it was not, therefore, available as a means of raising money. What it intended to authorize this company to issue was to be, therefore, a different manner of stock; a stock which, from the character of its incidents, would be not only valuable, but readily sought for; and hence it was, that language was employed in the act broad enough to include, by any fair construction, any kind or character of stock that the company might deem, not simply "available," but "most available," to issue.

If the legislature fully recognized that special and unusual guarantees would have to be accorded to this new issue of stock to make it sell, in the then stringency of the money market, to advantage, and it therefore properly remitted the whole matter as to the character of the stock that should be issued, to the judgment and discretion of

those whose rights alone would be affected thereby, we have no doubt upon the terms of this act that the company was fully empowered to issue guaranteed stock of the kind in question.  Such also was the contemporaneous construction placed upon this act by the officers and stockholders of this company, as shown by the report of the president of the company made in May, 1857, in which he "recommends to the stockholders the creation of $200,000 of additional stock guaranteed to bear seven per cent. dividends per annum, entitled to share equally with all other stock in any larger dividends which may hereafter be declared, without impairing its claim, always to receive at least seven per cent.," as well as by the resolutions passed by these same stockholders, in general meeting assembled, whereby the issuance of this stock was directed.  Nor is this all. Under the resolutions of May 27, 1857, 2,000 shares of seven per cent. stock were issued and taken.  Dividends on this guaranteed stock accrued during the war and were unpaid, whereupon the legislature recognized the legality and validity of these resolutions, and the rights of the guaranteed stockholders, and the liability of the company under them, by authorizing the company to increase its capital, and to issue another guaranteed seven per cent. stock to liquidate the dividends in arrear and unpaid, thus giving a legislative construction to this same act.  But it is objected that the act itself does not expressly authorize any lien to be given to secure this guaranteed stock.  It is admitted ; but we do not see that it was absolutely essential that this should be done.  When the legislature armed this company, as we have shown that it did, with the power to determine both the character of the stock it should issue, and the measure of preference or guaranty that should be attached to it, it, by necessary implication, conferred upon it also the power to secure the payment of both the principal and interest thereof by a deed of trust on the property and franchises

of the road, if it should be required to carry out their determination. So much for the act of February 13, 1856, and resolutions passed thereunder. We come now to the act of December 13, 1865, and here we shall be more brief. It read as follows:

"Be it enacted, &c., That the Richmond, Fredericksburg and Potomac Railroad Company be, and they are hereby, authorized, to increase the capital stock of the company to such extent as may be requisite to enable them to liquidate all arrears of debts, interest and dividends of the company, and to make such portion of the increased capital stock as they may deem advisable a guaranteed stock, on which dividends of not exceeding seven per cent. per annum may be guaranteed, to be paid semi-annually."

This act was unanimously approved and accepted by the stockholders, in general meeting, on the 21st November, 1866, and resolutions were unanimously passed, directing the issue of the guaranteed stock under said act. This act having been accepted by the stockholders, became incorporated into the charter, and was henceforth a part and parcel of it. Pierce on Railroads, pp. 5, 33 and 449, and authorities cited. The act is clear and unambiguous. It provides as well for the issuing of guaranteed stock as it does for guaranteed dividends to be paid thereon. The legislature might have provided for *stock* with *guaranteed dividends*, which would have been a guarantee of dividends but not of the stock, in a winding up; or for preferred stock, as contradistinguished from common stock, which is a preference over common stock in a distribution of net profits; but neither of these intentions existed, either with the legislature or the company.

The exigency to be provided for is set out in the act; it was necessary to "liquidate all arrears of debts, interests and (guaranteed) dividends," for the record shows that there were no other dividends in arrear. These debts, in-

terest and dividends, were liabilities of the company to be paid if it took all of its assets and property. They were debts of the company for which the company could be sued and judgments obtained. The legislature, therefore, properly provided that they should be converted into a stock of corresponding value—*i. e.,* a stock, the principal and dividends of which should be paid in any event. How did the company, its board of directors and stockholders construe it? Let us look to the. stockholders' meeting of November 21, 1866. At that meeting the stockholders unanimously adopted the report of its directors, which says: "But it is manifest that if these other arrears of interest and guaranteed dividends, equivalent to interest on bonds, which have accrued since May, 1861, and remain unpaid, are to be paid out of the current net earnings of the company, they would absorb those net earnings, postpone for another year the payment of current accruing interest on the funded debt of the company," &c, &c. They then recommended that the stockholders should formally accept the act and promptly fund these arrears of interest and guaranteed dividends into the guaranteed stock to be issued thereunder. This was accordingly done. The arrears of interest and guaranteed dividends were funded in the guaranteed stock; and payment of the principal and interest of said stock was secured by a deed of trust.

And thereafter the guaranteed dividends are to be found in the annual published statements of the receipts and disbursements of the company, charged along with the interest on the funded debt against the gross earnings and not against the net profits. We have thus briefly reviewed both of these acts, and the resolutions under which the various issues of guaranteed stock, held by the appellants, were made, and find ourselves forced to the conclusion that the guaranteed stock, issued under each of the above recited acts, is guaranteed or preferred capital in the strictest

sense; that the dividends are payable out of the gross earnings, and that in a division of the assets, these guaranteed stockholders must be paid, if need be, to the exclusion of the common stock. But, of course, as to any excess of semi-annual dividends to which they may·be entitled, beyond the three or three and a half per cent. guaranteed them, as it is not comprehended by the terms of either act, they stand upon the same footing as the common stockholders. Green's Brice's Ultra Vires, p. 172; *Bangor and Portmadoc Slab Co.*, L. R. 19, Eq. 59; *Harrison* v. *Mexican Ry. Co.*, L. R 19, 358; *Ragland* v. *Broadnax*, 29 Gratt. 401.

In this connection it may be said that we have examined with care all of the authorities relied on by the appellee, and find that none of them, except the solitary case of *Lockhart* v. *Van Alstyne*, 31 Mich. 83, conflict with the views hereinbefore expressed, and as that case proceeds largely upon the ground of public policy, it cannot be followed here against what appears to us to be the clear meaning of the statutes.

It is insisted for the appellee, however, that we are mistaken in this view, and that the stock held by the appellants is simply a preferred stock, as to which there is no guaranty of the ultimate payment of the principal or par value of the stock, and a guaranty of dividends only out of and in the event of net profits; and in support of this view they have cited some authorities which relate to what is ordinarily spoken of as preferred stock. This argument, however, utterly ignores the fact that there is such a thing as guaranteed stock with guaranteed dividends, or, what is the same thing, "preference capital," which, in a division of assets, will rank before and perhaps to the exclusion of the ordinary shares. Green's Brice's Ultra Vires, p. 172. Preference shares and stock take a multiplicity of forms according to the needs of the corporation creating and the ingenuity of those who control such corporations, where

the power to create them exists and may be properly exercised. Green's Brice's Ultra Vires, p. 171. And it has ceased to be a matter of uncommon occurrence to find an example of guaranteed stock with guaranteed dividends. In *Bangor and Portmadoc Slate and Slab Company*, L. R. 20, Eq. Cas. 59, the articles of association, which correspond to the charter here, provided: "The company in general meeting may increase its capital to such amount and upon such terms, and with or without special privileges or preferences to the holders of the shares in such increased capital, as it may from time to time deem expedient, and the same shall be increased accordingly." The stock of the company was increased by the issue of preference shares entitled to a preferential interest of ten per cent. per annum—the amount of the shares to be repaid on six months' notice, with twenty-five per cent. bonus. The company was wound up. Sir Richard Malins, V. C., held: "That the company had conferred a preference as to capital, as well as dividend, upon the new shareholders, and that they were entitled to the surplus assets in priority to the original shareholders." He further said: "It is clear to me that the articles of association did authorize the creation of preference shares, having such privileges as the company shall think fit, including a preference in every respect, both as to dividend and as to capital; and it seems highly probable that unless a company could give such preference, they would frequently be unable to raise the money they require for the undertaking." He also said: "It was not doubted in *Hutton* v. *Scarborough Hotel Company* (2 Dr. & Sm. 514) and in *Melhado* v. *Hamilton* (21 W. R. 619) that if the articles authorized the raising of preference shares, not only as to dividend but as to capital, in the event of breaking up, then the company might pass such a resolution as would effect their object."

In *Harrison* v. *Mexican Railway Co.*, L. R. 19, Eq. Cas.

358, Sir George Jessel, M. R., held, that "if the memorandum and articles of association of a company are silent on the subject, it is an implied condition that the shareholders are entitled to rank equally as to dividends, without preference or priority between themselves; but such implication will be rebutted if the articles of association contemporaneous with the memorandum contain clear provisions as to the preference or priority of classes of shares." And the power to create these guaranteed shares was held to exist in that case; and it is worthy of notice that although the words "in such manner," were not specially referred to in that case—for the very good reason, doubtless, that ample authority for the exercise of all the powers needed in that case was given by the other terms employed in the same article of the memorandum of association—yet the construction sought to be placed upon these words by the appellee in this case was not even suggested in the course of the argument. See, also, *Ragland* v. *Broadnax*, 29 Gratt. 401, a case not unlike the present in many respects, where the act expressly required that the "three per cent. dividend should be set apart out of the gross earnings." *The State* v. *Baltimore and Ohio Railroad Co.*, 6 Gill, 363.

It is also insisted that guaranteed dividends are only payable out of net profits. But in this the appellee is clearly mistaken, for it has been repeatedly held that payment of interest upon shares of capital stock out of gross earnings is legal, where, as in this case, it is authorized by statute. Pierce on Railroads, p. 126, note. And the case of *Ragland* v. *Broadnax*, 29 Gratt. 423, is a case in point, where this court upheld the charge of guaranteed dividends on the gross receipts. That was the case of a debt, or, to speak more accurately, of a debt and stock converted into guaranteed stock. The debt would have borne, if it had not been converted into stock, interest at the rate of six per cent. per annum, whether there were net earnings or not, and the

court held that the guarantee of three per cent. dividend on the whole stock, which formerly belonged to the State, was simply the six per cent. interest upon the debt which was converted into stock; and it also held that it was chargeable, in accordance with the plain provisions of the statute, upon the gross receipts.

It is also urged with great earnestness for the appellee, that the words "any excess of semi-annual dividend," mean an average rate of dividend; or, to use other words, it is contended that the dividend of, 1881 must be stretched over the whole twelve years, and that it is only in the event that the average rate on the common stock exceeds the guaranteed rate that the guaranteed stock can be entitled to share in such excess. But this theory of the appellee ignores the real nature of a dividend, for there can be no such thing as a dividend until it is declared. The earnings of the company or corporation belong primarily to the corporate body, and not to the shareholders. They have a certain claim to them, as well as to all the other property of the corporation; but their claims are always subordinate to the claims of creditors, and the latter approach much nearer to the condition of ownership than the former. *Boardman* v. *Lakeshore and Mich. So. Ry. Co.*, 84 N. Y. 157; *Thompson* v. *Erie R. R Co.*, 45 N. Y. 468. Whether a dividend shall be declared or not, is generally a matter within the discretion of the board of directors. And the common stockholders have no right to it until it is declared. But when this is done, the dividend belongs to the owner of the share at the time. In this case, the charter has fixed the periods for which dividends may be declared and limited the discretion of the board. By the 30th section the president and directors are authorized "annually or semi-annually to declare and make such dividend as they may deem proper of the net profits," &c. Having failed to exercise this power at least annually, as they

were directed to do, it was not possible for them to make the dividend extend over the entire period of twelve years. The dividend made in 1881 can only be regarded as a dividend for that year. In the case of *Mills* v. *The N. Railway of Buenos Ayres Co.*, L. R. 5, Chy. Appeals, 621, it was proposed to pay arrears of dividends out of sums they were going to carry back to revenue from capital, but they were arrears on preferred stock for the years 1869 and 1870, and the dividend on common stock was not under consideration. In *Bailey* v. *Railroad Co.*, 22 Wall. 632, the company had earned moneys greatly in excess of their current expenses; had no authority to increase their capital stock; and were forbidden by law to make dividends for the benefit of the stockholders beyond ten per cent. This excess had been expended in equipping their railroad and in the purchase of real estate and other properties, and the certificates were issued to show that the stockholders were entitled to reimbursement in the future. But in neither of these cases was it proposed to impair the rights of the guaranteed stockholders.

We now come to the main question in the case, which we think, however, after what has been already said, may be speedily disposed of.

The appellants are guaranteed stockholders, and they insist that they are entitled as stockholders to share in any excess of semi-annual dividend beyond their minimum or guaranteed dividend—that is to say, that they are entitled to like dividend obligations; and they insist further, that, as holders of these obligations, they will be entitled not only to participate in the division of the assets of the company at the winding up, but to receive dividends equal in amount to those paid on the common stock whenever dividends are paid on the latter. And upon both of these points we think they are clearly right.

It is admitted by the appellee that whilst there may be

found some unimportant differences in the phraseology used in the different resolutions under which the several issues of guaranteed scrip were made, and by which they are to be construed, that the meaning and legal effect of all of them is the same.    We will therefore only recite so much of the resolutions of May, 1857, as bears upon points under consideration.    By the second of these resolutions the "guaranteed shares" are "privileged to receive any excess of semi-annual dividend beyond three and a half per cent., which may at any time be paid on the common stock of the company, without impairing the guaranty of seven per cent. per annum," given by the same resolution. Now, this provision is perfectly clear and unambiguous, and expresses as clearly as language can express the idea that this guaranteed scrip shall share in any excess beyond what is necessary to pay a semi-annual dividend to the whole stock, guaranteed and common, of three and a half per cent.    *Bailey* v. *Railroad,* 17 Wall. 107 ; *Ragland* v. *Broadnax,* 29 Gratt. 512.

As we have before observed, the holders of the guaranteed scrip are stockholders.    They have bought this stock and have not taken it merely as a security for a loan.    And the guaranty of a minimum dividend, to protect which guaranty the lien was given, which lien, however, they are not now seeking to enforce, cannot be construed as converting this stock, in advance even of the contingency contemplated in the deed, into a debt or a security for a loan. And as to the direction of the deeds, that the surplus, if any, after payment of the principal and dividends of the guaranteed stock and all debts, should be distributed among the holders of stock other than that guaranteed, it manifestly amounts to nothing, so far as the rights of the guaranteed shareholders are concerned.

Now, as such stockholders, they are clearly entitled to share with the common stockholders in any surplus of

capital which may remain after both classes of stock, guaranteed and common, shall have received par and the guaranteed stockholders shall have also received any dividends that may be in arrear.   It is equally plain that in the event of an increase of the shares of common stock, in default of a corresponding increase in the capital of the company—*e. g.*, as is boldly asserted by the appellee to be the case here—they must be entitled to have a proportionate share of the dividend obligations, since, if such be not the case, it directly follows, as a necessary consequence, that the common stockholders will be permitted, in contravention of their express engagement with the guaranteed stockholders, to appropriate any excess there may be beyond what is required to pay each and every semi-annual dividend to the whole stock, guaranteed and common, of three or three and a half per cent., as in the particular case it may be.

It is insisted, however, by the appellee, and cases have been cited to show, that under ordinary circumstances, when a company has earned a dividend and desires, at the same time, to retain the money so earned for the purposes of the company in making improvements of its property or for the payment of its debts, it would be no violation of the law to retain such moneys, and, in lieu thereof, to issue to the stockholders a corresponding amount of stock.   But this rule, as we have before observed, has no application to a case like the present, where the inevitable effect of such a course would be to deprive the guaranteed stockholders of their clearly defined rights.

It is useless to prolong this opinion.   We are all fully satisfied that the guaranteed stockholders are entitled to receive like dividend obligations, and any dividends that may have been declared on them.   The decree of the circuit court of the city of Richmond must be reversed, and the cause be-

remanded to be further proceeded in to final decree in accordance with the views herein announced.

The decree was as follows:

This day again came the parties, by their counsel, and the court, having maturely considered the transcript of the record and the argument of counsel, is of opinion, for reasons stated in writing and made a part of this decree, that the decree aforesaid is erroneous. Therefore it is considered that the said decree be reversed and annulled, and that the appellants recover of the appellee, the Richmond, Fredericksburg and Potomac Railroad Company, their costs by them expended in the said circuit court and in this court.

And the court, proceeding to make such decree as the said circuit court ought to have rendered, doth adjudge, order and decree that the respective holders of all the guaranteed stock of the defendant company—the Richmond, Fredericksburg and Potomac Railroad Company—are entitled to receive from said company dividend obligations of said company of the form and character authorized by the resolutions of the stockholders of said company of November 16, 1881, and by the resolutions of the board of directors of said company of the 8th day of December, 1881, which have been issued to the holders of the common stock of said company, and that said dividend obligations shall be issued to the holders of the guaranteed stock aforesaid at the same rate at which they have been issued to the holders of common stock—namely: at the rate of seventy dollars of such dividend obligations for each and every share of guaranteed stock; and that on the dividend obligations so to be issued, there shall be paid the dividends which have been heretofore declared on similar dividend obligations issued to the common stockholders, excepting that the guaranteed seven per cent. stock shall not receive

the dividend declared on the dividend obligations as of January 1, 1882, and as to the dividend which was paid on July 1, 1882, the same shall be abated by ten cents per share, and that the guaranteed six per cent. stock shall receive of said dividend of January 1, 1882, on the dividend obligations only the sum of forty cents per share.

And it is further ordered, that these causes be remanded to the circuit court of the city of Richmond for proper proceedings to carry out this decree, and also for such proceedings as may appear proper in reference to the prayer of the plaintiffs for the allowance of counsel fees against the guaranteed stockholders not already represented by counsel in these causes. All of which is ordered to be certified to the circuit court of the city of Richmond.

DECREE REVERSED.